

JC/CLT/WDM: USAO 2025R00082

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | * CRIMINAL NO. DLB-25-cr-210 |
| | * |
| MAXWEL ARIEL QUIJANO-CASCO, | * (Conspiracy to Participate in a |
|   a/k/a Black City, | * Racketeering Enterprise, |
|   a/k/a Anonimo, | * 18 U.S.C. § 1962(d); |
| DANIEL ISAIAS VILLANUEVA | * Forfeiture, 18 U.S.C. § 1963, |
| BAUTISTA, | * 21 U.S.C. § 853(p), 28 U.S.C. § 2461(c)) |
|   a/k/a Jinete, | * |
| JOSUE MAURICIO LAINEZ, | * **UNDER SEAL** |
|   a/k/a Gordo, | * |
| | * |
| Defendants | * |
| | * |

*******

### INDICTMENT

### COUNT ONE
(Conspiracy to Participate in a Racketeering Enterprise)

The Grand Jury for the District of Maryland charges that:

At all times relevant to this Indictment:

### The Enterprise

1. *La Mara Salvatrucha*, also known as MS-13, was a gang composed primarily of immigrants or descendants of immigrants from El Salvador, with members operating in Maryland, including in Prince George's County, and throughout the United States.

2. The name "Mara Salvatrucha" was a combination of several slang terms. The word "Mara" was the term used in El Salvador for "gang." The phrase "Salvatrucha" was a combination of the words "Salva," which was an abbreviation for "Salvadoran," and "trucha," which was a slang term for "fear us," "look out," or "heads up."

3. In the United States, MS-13 had been functioning since at least the 1980s. MS-13 originated in Los Angeles, California, where MS-13 members banded together for protection against larger Mexican groups. MS-13 quickly spread to states across the country, including Maryland.

4. MS-13 was a national and international criminal organization and was one of the largest street gangs in the United States. Gang members actively recruited members, including juveniles, from communities with a large number of immigrants from El Salvador and other Central American countries.

5. At all times relevant to this Indictment, in the District of Maryland, and elsewhere, defendants **MAXWEL ARIEL QUIJANO-CASCO**, a/k/a Black City, a/k/a Anonimo; **DANIEL ISAIAS VILLANUEVA BAUTISTA**, a/k/a Jinete; and **JOSUE MAURICIO LAINEZ, a/k/a Gordo,** were members and associates of MS-13.

6. MS-13 members and associates referred to one another by their "gang names," or monikers, and often did not know fellow gang members and associates except by their monikers.

7. Members and associates of MS-13 were expected to protect the name, reputation, and status of the gang from rival gang members and other persons. MS-13 members required that all individuals show respect and deference to the gang and its membership. To protect the gang and to enhance its reputation, MS-13 members and associates were expected to use any means necessary to force respect from those who show disrespect, including acts of intimidation and violence.

8. Members and associates of MS-13 frequently engaged in criminal activity, including, but not limited to, acts involving murder, assault, extortion, and dealing in illegal controlled substances. MS-13 members and associates were required to commit acts of violence

to maintain membership and discipline within the gang, as well as against rival gang members. Participation in criminal activity by a member or associate, particularly in violent acts directed at rival gangs or as directed by gang leadership, increased the respect accorded to that member or associate, resulted in that member or associate maintaining or increasing his position in the gang, and opened the door to a promotion to a leadership position.  One of the principal rules of MS-13 was that its members, and persons seeking to become members, must attack and kill rivals whenever possible. In Maryland, MS-13 maintained a rivalry with the 18th Street Gang, among others.

9. Another principal rule of MS-13 was that its members must never cooperate with law enforcement.  Violation of this rule resulted in an order of death for the offender.

10. There were membership ranks within MS-13.  Some of the membership ranks from lower to higher, respectively, were "paro," "observacion," "chequeo," and "homeboy."  To move up in rank, members were required to prove their worthiness by "putting in work," which included committing crimes for or on behalf of MS-13.  For example, generally to advance from chequeo to homeboy, a member must have committed a murder.  After proving worth sufficient to become a homeboy, the member was required to complete an initiation process, often referred to as being "jumped in" or "beat in" to the gang.  During that initiation, other members of MS-13 beat the prospective homeboy member, until a gang member finished counting aloud to the number thirteen, representing the "13" in MS-13.

11. MS-13 was an international criminal organization and was organized in Maryland and elsewhere into "cliques," that is, smaller groups operating in a specific city or region. Cliques operated under the umbrella rules of MS-13.  MS-13 cliques often worked together cooperatively to engage in criminal activity and to assist one another in avoiding detection by

law enforcement. In Prince George's County, Maryland, one such clique of MS-13 was the Hollywood Locos Salvatrucha (HLS) clique.

12. **MAXWEL ARIEL QUIJANO-CASCO**, a/k/a Black City, a/k/a Anonimo; **DANIEL ISAIAS VILLANUEVA BAUTISTA**, a/k/a Jinete; and **JOSUE MAURICIO LAINEZ, a/k/a Gordo,** were members and associates of the HLS clique of MS-13.

13. Each clique was presided over by the "First Word," the leader or president of the clique. The leader was also referred to as "Primero Palabra," or "Shotcaller," or "Corredor," or "Runner." Some cliques had a "Second Word," or "Segunda Palabra," who was the second-in-command of the clique. Some cliques also had other leadership positions, including Treasurer. General members were required to take orders from these leaders.

14. MS-13 cliques kept in contact and reported to the supreme runners for their respective cliques, who were often based in El Salvador. Cliques contacted their leaders based in El Salvador using mobile telephones to keep them updated on gang business, for advice, and to resolve disagreements regarding operations among local cliques. Clique leaders in El Salvador directed orders to HLS and other cliques in Maryland and elsewhere. HLS and other cliques transferred money from the United States to clique leaders in El Salvador.

15. MS-13 members and associates, including members of HLS, met on a regular basis to, among other things, discuss gang affairs, organize extortion activities, enforce discipline, and report on acts of violence committed by their members, with the goal of inciting and encouraging further violence. Each clique held clique meetings where business specific to that clique was discussed. Any perceived indiscretions by members and associates for violations of MS-13 rules were talked about at clique meetings, and punishments were issued. Punishments

often took the form of beatings by fellow MS-13 members. More serious violations resulted in the issuance of a "greenlight." A greenlight is an order and/or approval to kill.

16. MS-13 received money and income from various sources, including member dues and the extortion, or "taxing," of brothels and other illegitimate businesses. Such funds, often referred to by MS-13 members and associates as "rent," were then used for gang purposes, including obtaining weapons and providing support for MS-13 gang members who were imprisoned in the United States, both inside and outside of Maryland, and in El Salvador.

17. MS-13 members and associates communicated about gang activities with other MS-13 members and associates in Maryland and elsewhere using mobile telephones, text messages, social media such as Facebook and WhatsApp, e-mail accounts, and other modes of communication. MS-13 members and associates used transnational and international money wire transfers to conduct and promote gang activities.

## The Racketeering Enterprise

18. MS-13, including its leaders, members, and associates, constituted an enterprise as defined in 18 U.S.C. § 1961(4), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce ("the Enterprise"). The Enterprise constituted an ongoing organization whose members and associates functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise.

## Purposes of the Enterprise

19. The purposes of the MS-13 Enterprise included, among other things:

   a. Preserving and protecting the power, territory, and profits of the Enterprise through the use of intimidation and violence, including assaults, murders, and threats of violence;

      b.      Promoting and enhancing the Enterprise and its members' and associates' activities;

      c.      Enriching the members and associates of the Enterprise through extortion, money laundering, and other illegal activities;

      d.      Keeping victims and potential witnesses in fear of the Enterprise and in fear of its members and associates through threats of violence and actual violence; and

      e.      Providing assistance to members and associates in order to hinder, obstruct, and prevent law enforcement officers from identifying offenders, apprehending offenders, and prosecuting and punishing offenders.

## Means and Methods of the Enterprise

20.    Among the means and methods by which the members and associates conducted and participated in the conduct of the affairs of the MS-13 Enterprise were the following:

      a.      MS-13 members and associates met and communicated about, among other things, the structure and organization of the gang; past criminal acts committed against rival gang members and others; MS-13 members and associates who were arrested or incarcerated; disciplining of MS-13 members and associates; police interactions with MS-13 members and associates; the identities of individuals suspected of cooperating with law enforcement and the proposed actions to be taken against them; plans and agreements regarding the commission of future crimes, as well as ways to conceal these crimes; the circulation and sale of firearms between and among MS-13 members; and the enforcement of gang rules.

      b.      MS-13 members and associates agreed to purchase, maintain, and circulate weapons and firearms for use in criminal activity by MS-13 members.

      c.      MS-13 members and associates agreed to purchase and distribute controlled substances and use proceeds from the sales to benefit the gang.

      d.      MS-13 members and associates received money and income from sources including the extortion of persons engaged in business activities and the distribution of controlled substances. Such funds were used for gang purposes such as obtaining weapons and providing support for MS-13 gang members, including those imprisoned in the United States (inside and outside of Maryland) and in El Salvador.

      e.      MS-13 members and associates agreed that acts involving murder, including conspiracy and attempts to commit murder, and other acts of violence, would be committed by members and associates of MS-13 against rival gang members and persons deemed as threats to MS-13 and for the purpose of imposing discipline within the gang, and on other occasions as deemed necessary.

      f.      MS-13 members and associates would investigate rival gang members or other persons targeted for violence; would obtain information about such targets, including locations frequented by them; and would use such information in their plans to attack such targets.

## The Racketeering Conspiracy

21.    Beginning on a date in or about 2024, and continuing through at least in or about August 2024, in the District of Maryland and elsewhere, the defendants,

**MAXWEL ARIEL QUIJANO-CASCO,**
a/k/a Black City, a/k/a Anonimo,
**DANIEL ISAIAS VILLANUEVA BAUTISTA,**
a/k/a Jinete, and
**JOSUE MAURICIO LAINEZ,**
a/k/a Gordo,

each being a person employed by and associated with MS-13, an enterprise engaged in, and the

7

activities of which affected, interstate and foreign commerce, did knowingly and intentionally conspire and agree with others to violate 18 U.S.C. § 1962(c), that is to conduct and participate, directly and indirectly, in the conduct of the affairs of MS-13 through a pattern of racketeering activity, as defined in 18 U.S.C. §§ 1961(1) and (5), which pattern of racketeering activity consisted of:

    a.    multiple acts involving murder, in violation of Md. Code Ann., Crim. Law §§ 2-201, 2-204, 2-205, 2-206, 1-201, and 1-202, and the Common Law of Maryland, punishable pursuant to Md. Code Ann., Crim. Law §§ 1-201, 1-202, 2-201, 2-204, 2-205, and 2-206;

    b.    multiple offenses involving drug trafficking, in violation of 21 U.S.C. §§ 841 and 846; and

    c.    multiple acts indictable under 18 U.S.C. § 1951 (relating to interference with commerce, robbery or extortion).

22.    It was further part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

## Overt Acts

23.    In furtherance of the conspiracy, and to affect the illegal object thereof, the defendants and their co-conspirators performed, participated in, and did the following acts, among others, in the District of Maryland and elsewhere:

    a.    Between in or about 2024 and in or about August 2024, **MAXWEL ARIEL QUIJANO-CASCO, a/k/a Black City, a/k/a Anonimo; DANIEL ISAIAS VILLANUEVA BAUTISTA, a/k/a Jinete; and JOSUE MAURICIO LAINEZ, a/k/a Gordo,**

and other members and associates of MS-13 distributed controlled substances, including marijuana and cocaine, the proceeds of which benefitted the gang.

b. Between in or about February 2024 and in or about August 2024, **MAXWEL ARIEL QUIJANO-CASCO**, a/k/a Black City, a/k/a Anonimo; **DANIEL ISAIAS VILLANUEVA BAUTISTA**, a/k/a Jinete; and **JOSUE MAURICIO LAINEZ, a/k/a Gordo,** and other members and associates of MS-13 paid dues twice a month for the benefit of the gang.

c. Between in or about February 2024 and in or about August 2024, MS-13 members and associates sent money obtained from the collection of gang dues to higher ranking MS-13 members.

d. Between in or about 2024 and in or about August 2024, members and associates of MS-13 transferred firearms that were manufactured outside the state of Maryland to other members and associates of MS-13.

e. On or about July 4, 2024, in Prince George's County, Maryland, **MAXWEL ARIEL QUIJANO-CASCO**, a/k/a Black City, a/k/a Anonimo; **DANIEL ISAIAS VILLANUEVA BAUTISTA**, a/k/a Jinete; and **JOSUE MAURICIO LAINEZ, a/k/a Gordo,** and other members and associates of MS-13 aided and abetted the murder of Victim-1 in Hyattsville, Maryland.

f. On or about July 13, 2024, **MAXWEL ARIEL QUIJANO-CASCO, a/k/a Black City, a/k/a Anonimo,** and **DANIEL ISAIAS VILLANUEVA BAUTISTA, a/k/a Jinete,** and another member and associate of MS-13 were promoted and received "Homeboy" status for their participation in the murder of Victim-1 on July 4, 2024.

9

g. Between in or about July 2024 and August 2024, **MAXWEL ARIEL QUIJANO-CASCO**, **a/k/a Black City, a/k/a Anonimo; DANIEL ISAIAS VILLANUEVA BAUTISTA**, **a/k/a Jinete;** and **JOSUE MAURICIO LAINEZ, a/k/a Gordo,** and other members and associates of MS-13 were given marijuana as a reward for their participation in the murder of Victim-1.

## Notice of Special Sentencing Factor

24. As part of their agreement to conduct and participate in the conduct of the affairs of the MS-13 enterprise through a pattern of racketeering activity, the following defendants committed the following act:

On or about July 4, 2024, in the District of Maryland, **MAXWEL ARIEL QUIJANO-CASCO**, **a/k/a Black City, a/k/a Anonimo; DANIEL ISAIAS VILLANUEVA BAUTISTA**, **a/k/a Jinete;** and **JOSUE MAURICIO LAINEZ, a/k/a Gordo,** did feloniously, willfully, and with deliberately premeditated malice, kill and murder Victim-1, in violation of Md. Code Ann., Crim. Law § 2-201(a)(1), and the Common Law of Maryland.

All in violation of 18 U.S.C. § 1962(d)

## FORFEITURE ALLEGATION

The Grand Jury for the District of Maryland further finds that:

1. Pursuant to Fed. R. Crim. P. 32.2, notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. §1963, 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c), in the event of the defendants' conviction on Count One of this Indictment.

## RICO Forfeiture

2. Upon conviction of the offense set forth in Count One of this Indictment, the defendants, **MAXWEL ARIEL QUIJANO-CASCO**, a/k/a Black City, a/k/a Anonimo; **DANIEL ISAIAS VILLANUEVA BAUTISTA**, a/k/a Jinete; and **JOSUE MAURICIO LAINEZ, a/k/a Gordo,** shall forfeit to the United States, pursuant to 18 U.S.C. § 1963(a):

   a. any interest acquired or maintained in violation of 18 U.S.C. § 1962;

   b. any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which the defendants established, operated, controlled, conducted, or participated in the conduct of, in violation of 18 U.S.C. § 1962; and

   c. any property constituting, or derived from, any proceeds obtained, directly or indirectly, from racketeering activity in violation of 18 U.S.C. § 1962.

## Substitute Assets

3. If, as a result of any act or omission of the defendant, any such property subject to forfeiture:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third person;

   c. has been placed beyond the jurisdiction of the Court;

11

      d.    has been substantially diminished in value; or

      e.    has been commingled with other property which cannot be divided without difficulty,

the United States, pursuant to 18 U.S.C. § 1963(m) and 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), shall be entitled to forfeiture of substitute property up to the value of the forfeitable property described above.

18 U.S.C. § 1963
21 U.S.C. § 853(p)
28 U.S.C. § 2461(c)

*/s/ Kelly O. Hayes* JC
Kelly O. Hayes
United States Attorney

David L. Jaffe
Chief
Department of Justice
Violent Crime and Racketeering Section

A TRUE BILL:

**SIGNATURE REDACTED**

Foreperson

Date: 7/10/25